UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:11-cv-08852-CBM (JCx) |
| Plaintiff, | |
| vs. | FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL |
| $175,982.21 IN U.S. CURRENCY, | |
| Defendant | |

## I. PROCEDURAL OVERVIEW

The Court, having previously made findings that the government has met its initial burden of probable cause to institute seizure and that by a preponderance of the evidence that the property is subject to forfeiture, held a bench trial on the issue of whether Claimants have made out an "innocent ownership" defense by a preponderance of the evidence. [Docket No. 56 at 6:23-7:1.]

## II. FINDINGS OF FACT

**A.** **Internal Revenue Service Investigation**

1. Claimant Kristian Kratz ("Kratz") has owned and operated the business known as Pacific Coast Hydroponics, Inc. ("PCH") since 2005. (Exh. 22.) PCH

sells equipment utilized for the indoor cultivation of plants, including marijuana. PCH's customers prefer to pay for their purchases with cash.

2.     As part of an investigation by the Internal Revenue Service, IRS investigators executed search warrants on Mr. Kratz' business premises and his residence on June 3, 2011.  At Mr. Kratz' home IRS investigators found $175,982.21 in U.S. currency in the master bedroom and found an indoor marijuana grow in a detached garage and shed behind the house. The currency was located as follows: $5,030.00 on top of a dresser in the master bedroom; $138,413.00 in a safe located inside of the closet in the master bedroom; and $32,539.21 leaning against the safe.  (Pre-Trial Conference Order ("PTCO") at 2:25-3:5.)

3.     The Drug Enforcement Administration was contacted for assistance and DEA Special Agents seized approximately 36 marijuana root bulbs growing in the shed on Kratz' property (weighing approximately 8.46 kilograms), approximately 70 marijuana root bulbs growing inside the garage (weighing approximately 2.80 kilograms), and approximately 3.53 kilograms of dried marijuana, also found in the garage. (PTCO at 3:6-12.)

4.     No paraphernalia related to the distribution or use of marijuana, including scales, packaging materials, baggies, customer lists, shipment or delivery records, cash counting machines, was found on the premises.

5.     The IRS later dropped its investigation of Mr. Kratz and his business. (PTCO at 3:17-18).

6.     On February 8, 2013, the government moved to dismiss, with prejudice, $32,539.21 of the defendant currency.  [Doc. No. 64.]  On February 14, 2013, the Court ordered that amount be dismissed, and indicated that the government seeks to forfeit the remaining $143,443.00 of defendant currency.  [Doc. No. 68.]

### i. Claimant's Business and Tax Records

7. PCH makes large cash deposits weekly to the bank and keeps the remaining cash on hand. (PTCO at 3:20-3:23.)

8. All cash payments received from PCH customers are recorded by cash registers at PCH's store and reported through "Z Reports" on a daily basis, (Exh. 32), and then reported as "Tender Received - Cash" in the S01 Cash Report, (Exh. 33). Kratz testified that he takes the daily cash receipts to his residence, where he has a safe. Kratz then prepares the cash sales for deposit to PCH's bank account and takes the cash to the bank more or less on a weekly basis. (*See also* Exhs. 28, 30.)

9. Kratz's bank records for his California Bank & Trust "Calbank Business Adv" Account lists the account owner as "Pacific Coast Hydroponics," which Claimant testified is his primary account, shows that from February 1, 2010 through December 31, 2010, he made total cash deposits of $1,598,477.10. (*See* Exh. 28.) Claimant's bank records also show that he made cash deposits to that account totaling $683,347.83 from January 1, 2011 through June 3, 2011. (*See* Exh. 30.) Therefore, from February 1, 2010 through June 3, 2011, he made total cash deposits to his account in the amount of $2,281,824.93.[1]

10. A "Quick Report," Exhibit 29, which is a report generated by Claimant's business accounting software and are prepared by Claimant, shows a total of $2,034,518.33 in cash deposits to the bank for February 1, 2010 through June 3, 2011.[2] (*See* Exh. 29.)

11. At trial, Claimant testified that the "Quick Reports" (Exh. 29) directly correspond with the California Bank & Trust statements (Exhs. 28, 30). However,

---

[1] The Claimant testified that the total cash received from his business minus the cash deposited in his bank between July 16, 2009 and May 22, 2011 accounts for the currency found at his home. However, the California Bank & Trust business account statements begin at February 2010, not July 2009.

[2] Exhibit 29 covers the period between July 16, 2009 and May 22, 2011.

there is a difference between the amount transferred to the bank as indicated in the Quick Reports and the cash deposited in California Bank & Trust account for February 1, 2010 through June 3, 2011:

$2,281,824.93 Cash Deposits from Bank Statements
- $2,034,518.33 Cash Deposits from Quick Report, Exh. 29
= $ 247,306.60

12. Exhibit 33 is a Quick Report that shows PCH's sales between July 15, 2009 and June 2, 2011. This Quick Report shows that between February 1, 2010 through June 2, 2011, PCH made cash sales in the amount of $2,191,353.40. (*See* Exh. 33.) The total deposits in the bank account as reflected in the Bank statements for the same period are $2,281,824.93. (*See* Exhs. 28 & 30.)

13. PCH reported cash assets of $459,286 at the end of the year on its 2009 tax return. (Exh. 24, at 345, line 1(d)). Claimant Kratz testified that this amount constitutes money in his bank accounts and also money on hand at the end of 2009. Claimant had a bank balance of $291,705.09 as of December 31, 2009 (*Id.* at 344). The difference between the cash assets and the bank balance as of December 31, 2009, which is the amount of cash on hand:

$459,286.00 Cash Assets at end of 2009
- $291,705.09 Bank Balance at end of 2009
= $167,580.91 Cash on Hand at end of 2009

14. Parties stipulated that during 2010, Pacific Coast deposited $1,614,344.24 cash in its bank account and reported another $86,560.88 in cash sales that were not deposited in its bank account. (PTCO at 3:26-4:1.)

15. For the year ending December 31, 2010, PCH reported to the IRS that it earned ordinary business income of $395,704 on gross sales of $2,305,473, and had cash assets of $372,187. (PTCO at 3:23-4:1.)

16. Claimant Kratz testified that the cash assets on the 2010 tax return

4

1  constituted the money in his bank accounts and also the money in cash at the end
2  of 2010. Claimant had a bank balance of $133,035.63 as of December 31, 2010
3  (Exh. 28). The difference between the amount in Claimant's bank account and
4  cash assets as reported to the IRS, which is the amount of cash that Claimant had
5  on hand as of the end of 2010 is:

>     $372,187.00  Cash assets at end of 2010
>  -  $133,035.63  Bank balance at end of 2010
>  =  $239,151.37  Amount of cash at end of 2010

17. The Court finds that there is a discrepancy between the amount of cash on hand at the end of 2010 that parties stipulated to ($86,560.88) and the amount calculated ($239,151.37). The Court will rely upon the stipulated figure for any further calculations.

18. From January 1, 2011 to June 2, 2011, Claimant reported $626,214.20 in cash sales from PCH. (*See* Exh. 33.) During the same period, Claimant deposited $683,347.83 in the bank. (*See* Exhs. 28, 30.)

19. Using the stipulated amount, $86,560.88, and adding it to the amount of cash sales as of June 2, 2011, $626,214.20, less the amount deposited in the bank equals the amount of cash on hand as of June 2, 2011:

>     $  86,560.88  Stipulated amount at the end of 2010
>  +  $626,214.20  Cash Sales between Jan. and June 2, 2011
>  =  $712,775.08
>  -  $683,347.83  Cash deposits made between Jan. and June 2, 2011
>        29,427.25  Amount of cash on hand as of June 2, 2011

20. Kratz refused to answer questions regarding the indoor marijuana grow on his property, invoking Fifth Amendment protections. These questions included whether Claimant was growing marijuana at his home on the day of the IRS search or anytime between 2009 and 2011, and the nature of the marijuana grow

found at his home.

21. Kratz testified under oath that he did not sell marijuana between 2009 and 2011, which includes the period immediately preceding the IRS investigation of Claimant's home.

22. At trial, the government offered into evidence a note by Claimant. (*See* Exh. 17.) Kratz testified that he recognized the note and that the line "get house @ 2K/month and grow" means to grow as a person and that he had a garden. Additionally, Kratz testified that the reference to "seeds" refers to seeds for vegetables such as tomatoes, which Kratz testified he grows in his garden.

23. The government questioned Claimant about Exhibit 18, a note written by Kratz and prepared eight years ago. He responded to questions regarding the meaning of the phrase "need safe address to receive mail and packages," by answering that he needed a secure location to receive the expensive equipment that PCH sells. The Court finds Kratz's responses to questions regarding both Notes to be credible.

### III. CONCLUSIONS OF LAW

24. The facts, insofar as they may be conclusions of law, are hereby incorporated by reference.

25. CAFRA, 18 U.S.C. § 983, governs forfeiture proceedings commenced after its effective date, August 23, 2000. This applies to actions instituted pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 983(c). *See* 18 U.S.C. § 983(i)(1).

26. 21 U.S.C. § 881(a)(6) provides for the forefeiture of "[a]ll moneys…or other things of value furnished, or intended to be furnished by any person in exchange for a controlled substance…all proceeds traceable to such an exchange, and all moneys…used or intended to be used to facilitate any violation of this subchapter."

27. 18 U.S.C. § 981(a)(1)(C) provides for the forefeiture of "[a]ny property,

real or personal, which constitutes or is derived from proceeds traceable to…any offense constituting 'specified unlawful activity'… or a conspiracy to commit such offense." "The government may… institute a forfeiture action if it can demonstrate probable cause for doing so, based upon untainted evidence." *United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 948 (9th Cir. 2010) (citing *United States v. $493,850.00 in U.S. Currency,* 518 F.3d 1159, 1169 (9th Cir. 2008)).

28. The Ninth Circuit uses the "aggregate of the facts test" to determine whether the government has the requisite probable cause to institute forfeiture. *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980-82 (9th Cir. 2002). Under this test, the government has met its burden if "the aggregate of facts gives rise to more than mere suspicion that the property was exchanged for or intended to be exchanged for drugs." *United States v. $5,644,540.00 in U.S. Currency*, 799 F.2d 1357, 1363 (9th Cir. 1986). The presence or absence of any single fact is not dispositive. *Id*. The Government may rely on circumstantial evidence to meet its burden. *United States v. Real Prop. Located at 22 Santa Barbara Drive*, 264 F.3d 860, 872 (9th Cir. 2001).

29. After meeting this initial burden, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). The government may rely on evidence used in supporting probable cause, as well as additional evidence gathered after the filing of the complaint. *See $493,850.00 in U.S. Currency,* 518 F.3d at 1170 (citing 18 U.S.C. § 983(c)(2)).

30. Once the Government has met the burden of probable cause to institute the proceeding, and has met the burden of preponderance of the evidence that the assets are subject to forfeiture at trial, only then does the burden shift to the claimant to show that he is an "innocent owner" by a preponderance of the

evidence. 518 F.3d at 1170; 18 U.S.C. § 983(d).

31. An innocent owner defense is an affirmative defense in which the claimant bears the burden of proving that he is an innocent owner by a preponderance of the evidence that the owner who either "did not know of the conduct giving rise to forfeiture" or "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d); 518 F.3d at 1170.

32. The law of the Ninth Circuit states that where the claimant proves, by a preponderance of the evidence, "an alternate theory of origin for the currency," he has shown an innocent owner defense. 518 F.3d at 1170.

33. Claimant asserts that he is an innocent owner because the currency comes from a legitimate source, his hydroponics business, and thus offers an "alternate theory of origin for the currency." 518 F.3d at 1170.

34. The Court received into evidence Quick Reports and bank statements indicating that some of the defendant currency came from a legitimate business.
- Exhibit 29, PCH's internal accounting "Quick Reports" showing cash deposits made to the bank, is given less weight. (*See* Finding #11.) The Court gives more weight to the California Bank & Trust Statements, (Exhs. 28, 30), which cover the period of February 2010 through July 2011. Due to this difference, the Court relied on the bank statements.
- The Court compared the bank account statements with the cash received from cash sales at PCH for February 2010 through July 2011. Parties had previously stipulated that Claimant had $86,560.88 of cash on hand at the end of 2010. As calculated in Finding #19, Claimant had $29,427.25 in cash from a legitimate source as of the date of the seizure, June 2, 2011.

35. Claimant testified that some of the currency came from the legitimate business, as follows.

- That it was his practice to keep un-deposited cash in his safe at home from his cash-intensive business;
- That he would not deposit all of the cash from his business because he would be charged for deposits to his bank account in excess of a certain amount;
- That he did not engage in the sale of marijuana during the relevant time period;

36. The Court finds Claimant has shown by a preponderance of the evidence, of a legitimate source for some of the currency found at his home. The Court further finds that Claimant has satisfied its burden of proof as to an "alternate theory of origin" for the $29,427.25 of the Defendant currency the government seeks to forfeit. *$493,850.00 in U.S. Currency,* 518 F.3d at 1170.

37. The Court will also not draw an adverse inference from Claimant's invocation of the Fifth Amendment since he may be the subject of a future criminal investigation. Although Claimant has been informed that he is no longer the subject of a criminal investigation regarding federal tax liabilities, the Government has not indicated whether Kratz is the subject of a future criminal investigation regarding the marijuana at his home. *See U.S. v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995).

\\
\\
\\
\\
\\
\\
\\
\\

1       The Court finds, therefore, that Claimant has met his burden as to the
2 "innocent owner" defense and therefore the Government improperly forfeited
3 $29,427.25 of the Defendant Currency obtained from Claimant's home, and is
4 hereby ordered to return that amount with interest to claimant. The Government
5 therefore properly forfeited the remaining $114,015.75 of the Defendant Currency.
6
7 **IT IS SO ORDERED.**
8 DATED: August 14, 2013
                                              CONSUELO B. MARSHALL
                                          UNITED STATES DISTRICT JUDGE

CC:FISCAL